## FREDERICK CARL FICK v. JOE WOLFINGER AND ANOTHER.

198 N. W. 2d 146.

May 12, 1972—No. 42879.

*O'Brien, Ehrick, Wolf, Deaner & Downing, L. W. Downing,* and *R. P. Pearson,* for appellant.

*Newcome, Wallace & Newcome, Thomas W. Newcome, Holst, Vogel, Erdman & Vogel,* and *Milton I. Holst,* for respondents.

Heard before Knutson, C. J., and Murphy, Otis, and Peterson, JJ.

PER CURIAM.

Plaintiff, Frederick Carl Fick, injured while working as a farmhand when he came in contact with an unguarded power takeoff shaft supplying power from a tractor to a rotary chopper, brought this suit for negligence against his employers, Joe and Mary Lou Wolfinger, and the owner of the rotary chopper, Alvin Vieths. Plaintiff's claim against defendant Vieths was dismissed at the conclusion of plaintiff's case. Plaintiff's claim against defendants Wolfinger was decided against him by the jury's answers to seven interrogatories. The jury found that plaintiff was 70 percent negligent and defendants Wolfinger were 30 percent negligent; and the jury found, also, that plaintiff had assumed the risk of injury. This appeal is from an order denying plaintiff's motion for a new trial and from the judgment. We affirm.

The accident occurred late in the afternoon of January 2, 1964, on the Wolfingers' farm in Goodhue County, where plaintiff was employed.[1]

---

[1] Plaintiff had worked for the Wolfingers for almost a year under the following arrangement: In return for his work, plaintiff received monetary compensation based on the number of hours worked, plus rent-free

On the morning of that day, plaintiff and defendant Joe Wolfinger agreed that plaintiff should proceed to chop corn stalks, using defendant Vieths' rotary chopper. On an earlier occasion, Wolfinger had obtained Vieths' permission to use Vieths' rotary chopper and, on that occasion, plaintiff had operated the chopper without incident. Neither of them undertook to obtain Vieths' permission on this occasion, however, simply assuming that he would give permission if asked. Wolfinger testified that when he told plaintiff to use the Vieths chopper he did not know that its safety shield was missing; but in a statement which he made several weeks after the accident, Wolfinger stated that, when he had used the chopper in "other years," it had not had a guard.

Plaintiff was himself aware that the chopper had no safety shield when he greased it and hooked it up to the tractor. He testified that he did not at that time know that there was a shield for this particular chopper, although he admittedly knew that choppers generally came equipped with shields. He was aware of the danger of coming into contact with an unguarded power shaft when the power takeoff unit was operating,[2] for he had done farmwork for years and was very familiar with the operation of tractors and power takeoff units. He knew that it was sound practice either to turn off the ignition or to put the power takeoff unit in disengaged position before getting off the tractor.

Plaintiff had no difficulty with the chopper when he began to operate it in the early afternoon. Sometime during the afternoon, Wolfinger came out to the field to talk with plaintiff and see how things were going. On this occasion plaintiff followed the sound practice of turning off the power takeoff unit and putting the tractor in park before he got off the tractor to talk with Wolfinger.

After Wolfinger left, plaintiff resumed operating the chopper. He started out in fourth gear but, since the field was rough and the power steering was giving him some difficulty, he shifted down to third gear with a half-open throttle. As he made his rounds he stood part of the time and sat part of the time. Plaintiff testified that he recalls that the sun was setting and that he had decided to make one more round before

---

house, and a number of side benefits such as milk, butter, and meat. The Wolfingers had first priority on plaintiff's time, but when they did not have work for plaintiff they permitted him to work for other farmers.

[2] Plaintiff's expert, Carlton Zink, testified that the unguarded power shaft was especially dangerous in that one could inadvertently allow his clothing to come into contact with the shaft, pulling one onto the shaft itself.

quitting for the day. He testified that the next thing he remembers is waking up in the dark and finding himself twisted and tangled in the power takeoff shaft with his head facing toward the tractor. No one other than plaintiff witnessed the accident.

Wolfinger and Harvey F. Hinrichs, both of whom arrived on the scene at approximately 5:20 p. m., in response to plaintiff's calls for help, found plaintiff entangled horizontally in the shaft with his clothes ripped off. In a statement which he made some 2 months after the accident, Wolfinger stated that as he was helping to free plaintiff he noticed that the ignition was on. At trial, however, he testified that he did not check the ignition until the following day, when he checked and found that the ignition was on, the tractor was in neutral, the throttle in low, and the power takeoff in engaged position. Plaintiff's son testified that 2 days following the accident he went to the scene with Wolfinger and found the tractor in third gear, half throttle, and the power takeoff in engaged position. Wolfinger did not remember going to the scene with plaintiff's son.

1. Plaintiff and defendants Wolfinger each contend that they were entitled to directed verdicts on the primary issue of whether they were negligent. We hold, however, that the jury could reasonably find that all of these parties were in some degree negligent and that the comparative degree of their negligence was even more clearly an issue for the jury.

With respect to plaintiff's own negligence, the jury could reasonably conclude that plaintiff got down off the tractor without first turning off the power takeoff unit and negligently got himself entangled in the power shaft. The apportionment of his comparative negligence was, under the circumstances, clearly a matter for the jury's assessment. (The jury could, from the recited evidence, also reasonably find that plaintiff had assumed the risk, a defense considered later in this opinion.)

With respect to defendants Wolfingers' negligence, the issue as to whether they breached a duty owed plaintiff is less readily resolved. Those defendants had an employer's duty to furnish their employee with reasonably safe machinery, including those safety appliances which normally come with such machinery, and to warn or instruct him as to the dangers connected with the operation of the machinery. Grussing v. Binger, 262 Minn. 345, 114 N. W. 2d 699 (1962); Berg v. Johnson, 252 Minn. 397, 90 N. W. 2d 918 (1958); Jenkins v. Jenkins, 220 Minn. 216, 19 N. W. 2d 389 (1945); Beard v. Chicago, M. & St. P. Ry. Co. 134 Minn. 162, 158 N. W. 815 (1916); Annotation, 67 A. L. R. 2d 1120, § 4.

They were not wholly absolved of this duty merely because plaintiff was himself aware of the risks of using the unsafe machinery. Grussing v. Binger, *supra;* Hightower v. Edwards, 445 S. W. 2d 273 (Mo. 1969). As we stated in Grussing (262 Minn. 349, 114 N. W. 2d 702), "since it is the duty of the servant to obey orders given to him if not manifestly unreasonable, the employer must use reasonable care to protect the servant from dangers in execution of the orders and will be held liable for his negligence in this regard." The jury could find, as implicitly it did, that defendants Wolfinger breached their duty either to furnish plaintiff with a safe chopper or to instruct him that a safety shield was available and that he should find and use it. But such finding of negligence did not, under the circumstances, compel a finding that their negligence was a major contributing cause of plaintiff's injury.

2. We must turn, therefore, to those other issues asserted by plaintiff as grounds for a new trial. The first of them is that the trial court denied him a fair trial by granting counsel for defendant Vieths and counsel for the Wolfingers each three peremptory challenges, to which plaintiff made seasonable objection. Minn. St. 546.10 provides, in part:

"* * * Each party shall be entitled to three peremptory challenges * * *. The parties to the action shall be deemed two, all plaintiffs being one party, and all defendants being the other party, except, in case two or more defendants have adverse interests, the court, if satisfied that the due protection of their interests so requires, may allow the defendant or defendants on each side of the adverse interests not to exceed three peremptory challenges."

In Eilola v. Oliver Iron Min. Co. 201 Minn. 77, 275 N. W. 408 (1937), the plaintiff sued one Frederickson and Frederickson's employer for assault, claiming that Frederickson committed the assault within the scope of his employment. Defendants there, as here, interposed separate answers denying liability and appeared at trial by separate counsel. We held that the trial court correctly refused to grant each defendant three peremptory challenges, and indicated that defendants' interests were not adverse when there were no cross issues between them. There were likewise no cross issues between the Wolfingers and Vieths. It is true that each party wanted to escape liability and preferred that the other suffer rather than itself, but that alone does not mean that the parties had adverse interests. Carr v. Davis, 159 Minn. 485, 199 N. W. 237 (1924). See, also, Annotation, 32 A. L. R. 3d 747, § 4[a].

We are not aware of any Minnesota cases dealing with the effect of the trial court's allowing an excessive number of peremptory chal-

lenges, but an annotation on the subject, in 95 A. L. R. 2d 957, 962, summarizes the decisions from other jurisdictions as follows:

"As to the effect of allowing a greater number of peremptory challenges than is specified by statute, that is, whether the prejudicial character of the error must be shown or will be presumed from the mere departure from the exact requirements of the statute, the decisions in civil cases, from their inception to the present, are not uniform, although there is a tendency, perhaps, in favor of the necessity of showing prejudice.

\* \* \* \* \*

"The numerical weight of authority in civil cases supports the rule that a judgment will not be reversed for error in allowing one or more peremptory challenges in excess of that provided by statute, unless the complaining party shows that he has exhausted his peremptory challenges and has suffered material injury from the action of the court, and that as a result thereof one or more objectionable jurors sat on the case, or for some other equally cogent reasons."

For an exhaustive, well-considered opinion on the subject, see, Stevens v. Union R. Co. 26 R. I. 90, 58 A. 492, 66 L. R. A. 465 (1904). Cf. Tuttle v. Farmer's Handy Wagon Co. 124 Minn. 204, 144 N. W. 938 (1914), where the court's refusal to allow each defendant to exercise three peremptory challenges, although considered possibly erroneous, was not held to have resulted in any apparent prejudice.

We think that plaintiff has failed to demonstrate that any error of the trial court was prejudicial. A fair trial for plaintiff requires trial by an impartial jury, but the adverse verdict does not, without more, demonstrate that he was deprived of such a trial.

3. Several rulings of the trial court on the admission of evidence are urged by plaintiff to constitute reversible error. We hold these contentions to be without merit.

a. Two of the contested rulings relate to certain questions put to plaintiff's farm safety expert, Carlton Zink. The first question, to which defense objection was sustained, was: "\* \* \* [D]o you have an opinion as to whether or not it conforms with safety practice in farm operation for an employer to supply a farm employee with such an unguarded power shaft?" This excluded question, however, was only one of several related questions on the subject. Over defense objection, Zink had been permitted to explain why it was dangerous to furnish an employee a rotary chopper without a shield on the power shaft—the kind of evidence from which a jury could permissibly infer negligence. And with-

out objection, he had testified regarding whether the safety shield interfered with the operation of the chopper and whether, if it had become worn, the shield could easily be repaired. However, the general question as to whether, in effect, the defendants violated safety practices in farm operation by failing to take ordinary, reasonable precautions to supply their employee with a safely guarded piece of farm machinery was for the jury itself to decide. The trial court stated that it is "within the realm of common sense day to day activities of the jury to decide and they don't need an expert opinion to cover that." To have permitted Zink to testify that the Wolfingers' conduct violated farm safety standards would have been to permit an expert, by opinion testimony, directly to answer the ultimate question of whether a party's conduct was negligent. See, e. g., Tracey v. City of Minneapolis, 185 Minn. 380, 241 N. W. 390 (1932); Goodsell v. Taylor, 41 Minn. 207, 42 N. W. 873 (1889).

The other excluded expert testimony related to the position of the gears on the tractor following the accident. Wolfinger had testified that he had checked the gear shift on the tractor on the day following the accident and observed that it was in neutral position. Seeking to refute that testimony, plaintiff undertook through Zink to establish that one could not ascertain by visual observation whether or not the gear shift was in neutral or in one of the forward drive positions. The trial court sustained an objection to a question designed to elicit Zink's testimony that each range has a neutral position and that one could not visually observe whether the gear was in neutral or forward drive within that range. Although the trial court ruled that it was a matter for the jury to ascertain from its own assessment of the evidence, including an examination of the exhibits, Zink did, with the aid of an exhibit showing where the neutral positions existed within the gear shift pattern, subsequently give the very testimony which plaintiff had undertaken to elicit.

b. Plaintiff contends that the trial court erred in refusing to admit certain answers to interrogatories by Wolfinger for the purpose of impeaching Wolfinger's trial testimony. We need only observe, on this issue, that Wolfinger at trial did not deny making the prior statements, so that the trial court could properly refuse to admit the statements for impeachment purposes. There could be no prejudice to plaintiff by their exclusion because, by admitting that he made the prior statements, Wolfinger impeached himself. See, Price v. Grieger, 244 Minn. 466, 70 N. W. 2d 421 (1955); Carroll v. Pratt, 247 Minn. 198, 76 N. W. 2d 693 (1956).

c. The trial court directed a verdict for defendants on plaintiff's claim that, prior to the accident, defendants had negligently misrepresented that plaintiff was covered by their insurance and need not get insurance of his own. The trial court had excluded certain testimony relating to these alleged misrepresentations because there was no evidence that plaintiff had relied on such representations.

4. Plaintiff contends that the trial court committed prejudicial error in giving or in refusing to give certain instructions. His principal claim is that the court's instruction on assumption of risk, incorporating Minnesota Jury Instruction Guides, Instructions 135 and 136, was erroneous. While plaintiff's appeal was pending, we decided in Springrose v. Willmore, 292 Minn. 23, 192 N. W. 2d 826 (1971), that assumption of risk would no longer be a separate and absolute defense and was to be recast as an aspect of contributory negligence and apportioned under our comparative negligence statute. Except for the case itself, our decision was only prospective in application, however, and is inapplicable to plaintiff's action. Unlike Springrose, moreover, plaintiff was precluded from recovery by the jury's supported finding that he was negligent in a degree substantially exceeding 50 percent. We have carefully considered all other instructions which the court gave and the requested instructions which it denied but conclude that an extensive discussion of them would serve no useful purpose. It is sufficient to say that, considered in complete context, there was no reversible error.

5. Plaintiff contends, in conclusion, that a new trial should be granted because of misconduct by the bailiff in preventing the jury's communication with the trial court for additional instructions on the issues of negligence. Even were we to assume from the affidavits of some of the jurors that the bailiff denied them access to the court for that purpose, it is fully apparent to us, as it was to the trial court, that the instructions that the jury would have requested related only to the effect of their answers to the special interrogatories on the ultimate outcome of plaintiff's claim.[3] The instructions, of course, could not have been

---

[3] If this was not their purpose, the procedure used by plaintiff for informing the court was inappropriate to his purpose. Rather than promptly approaching the trial court with a request that the jurors be interrogated at a hearing on the matter, Schwartz v. Minneapolis Suburban Bus Co. 258 Minn. 325, 328, 104 N. W. 2d 301, 303 (1960); Olberg v. Minneapolis Gas Co. 291 Minn. 334, 342, 191 N. W. 2d 418, 424 (1971), plaintiff's counsel unilaterally obtained affidavits from jurors. Plaintiff, moreover, included in the appendix to his brief only those affidavits

given even if requested, McCourtie v. United States Steel Corp. 253 Minn. 501, 515, 93 N. W. 2d 552, 562 (1958), and the motion was on that ground properly denied.

Affirmed.

MR. JUSTICE MACLAUGHLIN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

tending to support his claim, there being other affidavits before the trial court of significantly different tenor.